Thank you, Your Honor. Eric Bunstead on behalf of Elaine Marshall, Independent Executive of the State of E. Pierce Marshall. In the time that I have this morning, there are three key points that I'd like to address. First, that Vicki's claim is barred by the Texas statute of frauds. Secondly, that the Bankruptcy Court lacked jurisdiction to finally dispose of Vicki's claim. And third, that her claim is precluded under the Federal Full Faith and Credit Act as a matter of Texas law. On the first point, the Texas... Justice Alito Counsel, could you... I don't want to forget it. My key concern with your case is this. I was impressed with the amicus brief and, of course, with your brief on the issue of core and non-core. However, when I apply the various criteria, it's difficult for me to say that this isn't a counterclaim related to, which takes, which is, it seems to push me over to the core side of my flow chart that I drew. How do you get there from here? How do you get it to the non-core side on account, despite the counterclaim? Three key points, Your Honor. First is that the key to understanding Section 157 of the Federal Code conferring jurisdiction on the Bankruptcy Court is to understand that it is in response to the Marathon case, and that we do not lightly set aside the Constitution and a party's constitutional right to have its state law claim adjudicated by an Article III judge. No problem so far. Correct. Now, in response to Marathon, Congress did not intend to confront the Supreme Court. Congress intended to accommodate the Supreme Court's analysis in Marathon. No problem. What Congress did in enacting Section 157b-1, 157b-1 is the only section that confers final order jurisdiction. 157b-2 is a definitional section. 157b-1 confers final order jurisdiction on core proceedings that either arise under the Bankruptcy Code or arise in a case under the Code. Statutorily, what Congress has done is it has said if it does not arise in or arise under, it doesn't matter if it's a core proceeding. There's no final order jurisdiction. Now, this Court has, in the Eastport case, defined what arising in and arising under means. Arising under means the cause of action must depend for its existence on a provision of the Bankruptcy Code. This cause of action doesn't. It depends for its existence on state law. This Court has defined arising in jurisdiction to mean a matter that is uniquely bankruptcy-administrative in nature. It could not exist in another court. This claim, obviously, state law court claim can exist in another court. It was, in fact, asserted in the Texas Probate Court. It does not meet that test. Now the arising under. Now, arising under depends for its existence on a provision of the Bankruptcy Code, like a preference action, fraudulent transfer. Her cause of action arises under state law. Again, does not arise in because her cause of action is not a uniquely administrative matter in bankruptcy, such as supervising trustees, that kind of thing. Let me ask you right there. I have two questions in this regard. One, wasn't the her bankruptcy proceeding discharged? That is, she was her own bankruptcy petition had been discharged by the time this case went to trial, right? Correct. Does that make any difference on core and non-core? It does in two respects. Actually, it makes a difference for jurisdiction, but not so much for core and non-core. Jurisdiction, yes. Core and non-core, not so much. Her plan, though, did provide for that her debtors would be paid off by any recovery she made against, obtained against. Correct, Your Honor. The plan. Does that make any difference in terms of what you were just arguing? No, Your Honor. That makes a difference on whether her claim is at least related to her bankruptcy  That's that prong of it. Our argument is that under this Court's decision in Fights, if there aren't actually unpaid creditors that will receive the benefit of the proceeds of any recovery, then there's no, there's not even related to jurisdiction. So there's no bankruptcy jurisdiction at all. The core and non-core goes to what kind of jurisdiction the bankruptcy court has, whether it's final order or whether it's can only issue recommended findings of fact and conclusions of law. Let me back you up a minute to 157b-2. Yes, Judge Carson. 157b-2 says claims against the estate are core. And 157b-2c says counterclaims by the estate against persons filing claims against the estate are core. Yes. That is the key section here. And I'm still confused about why it doesn't apply. Yes, Judge Kleinfeld. If you look at the, I think it perhaps is very helpful to actually look at the statute. Yes. It's on page 2A. What to underline and mark up. Yes. If you look first at section 157b-1, focus on that for a minute. Bankruptcy judges may hear and determine all cases under Title XI. That's the actual bankruptcy case itself. And, and this is the key language, all core proceedings arising under Title XI or arising in a case under Title XI. B-1 confers jurisdiction. If Your Honor looks at B-2, notice it says core proceedings include. B-2 only defines one of the terms in 157b-1. It does not define arising in or arising under. It only defines what is a core proceeding. Why is that there? Because to comply with Marathon, Congress basically created a screening mechanism in 157b-1. It's not enough to say it's a core proceeding. Why? Because if Your Honor looks at the definitions of core proceedings, they are so broad that they will include everything under the sun that could be brought. Literally everything. Look at Category A, matters concerning the administration of the estate. Well, basically everything concerns the matter of the administration of the estate if it would increase the amount to be distributed. And if you look at the catch-all provision in O, other proceedings affecting liquidation of the assets of the estate or adjustment of the debtor-creditor relationship, that would include the very cause of action at issue in Marathon, the breach of contract action. Is there a case that says even if 157b-2 says it's core, nevertheless, it isn't? Yes, Your Honor. The decisions of this Court, several of them. Castle Rock, which involved the State law. Castle Rock will do the job for you. Castle Rock and Dunsmore, there was a tax claim there. The Security Farms case, where there was a State law counterclaim. Now, those were all situations, or at least in two of those cases, where the creditor had filed proofs of claim. Also, this Court's decision in Los Angeles Trust, where this Court considered a claim by the creditor under a lending relationship and a counterclaim by the trustees for the same lending relationship, and this Court said that unless these two matters are so inextricably intertwined that we might say it arises in, then it's not something which can deprive you of an Article III right. So the ---- What you would do is say the definition in 157b-2 of core is fine as far as it goes, but even if it's core, it has to arise in or arise under Chapter ---- Exactly, Your Honor. And that's why this Court ---- Yes, Your Honor. That's why ---- If it's a State law-generated cause of action, then it doesn't arise in or arise under? That's correct, Your Honor, under this Court's definition. What that theory is, it seems to narrow core too much. The basic idea of core is you get all the debtors' assets together in a pot, and you get all the debtors' creditors together to file their claims, and then you allow whatever claims are allowable to the extent they are and divvy up what's in the pot among the creditors so everybody gets their fair share, and the claims are reduced by the counterclaims. It seems to me that your interpretation goes too far. But, Judge Kleinfeld, that's the beauty of it. It doesn't deprive the Bankruptcy Court of Jurisdiction. It simply deprives the Bankruptcy Court of Jurisdiction to enter a final order. The bankruptcy judge can still resolve the claim, but the bankruptcy judge issues recommended findings of fact and conclusions of law subject to de novo review. That's where you're bringing Marathon in. Correct. You're saying it's not final then because it's a State law claim. Right. So you need the Article III judge. Exactly. And that preserves ---- But that doesn't deprive the Bankruptcy Court of Jurisdiction to adjudicate it. It just deprives the Bankruptcy Court of Jurisdiction to finally adjudicate it. So there are really two arguments here, Judge Kleinfeld. The first argument is that her claim cannot be a final order under 157b1. It's not something that's subject to final order jurisdiction under 157b1 because it doesn't arise in or arise under. Now, we have a second alternative argument. Let's assume that it for some reason arises in, contrary to this Court's standards. This Court has said repeatedly that a matter which does not depend for its existence on the Bankruptcy Code and could be brought somewhere else is non-core. It said so in the Dunmore case. It said so in many other precedents. Okay. Does it mean, though, that the bankruptcy judge's decisions on just routine claims, the plumber's bill didn't get paid, that kind of thing, they all wind up with a district judge because they're State contract law, State tort law claims? As a matter of constitutional principle, yes. As a matter of practical reality, in most situations, creditors don't raise these concerns and creditors consent. So as a matter of where the creditor doesn't consent, as here, then the constitutional right endures improperly so. Now, our second argument, alternative argument, is let's assume that, in fact, her claim arises in. We can put aside the analysis I just said and let's assume that this Court's definition can be modified and arising in may include a counterclaim to a proof of claim. We don't concede the first point, but let's assume the second point. Then this Court has said in Los Angeles Trust, as other courts of appeals have said, the Second Circuit and CBI holdings, a counterclaim to a proof of claim only arises in if the two are so inextricably intertwined that you cannot adjudicate the claim without the counterclaim. Now, there's a perfect example in the CBI holding case, the Second Circuit decision, that you had a claim for fees by the accountant and a counterclaim that the fees were shoddy. You can't determine whether the fees should be allowed unless you determine whether the services were shoddy. In the Second Circuit decision in CBI holding, the Second Circuit expressly distinguished the facts of this case, expressly distinguished the facts of the district court opinion in this case. When the Second Circuit said, in Marshall, of course, we distinguish that case from the fee case because in Marshall, the proof of claim and the counterclaim were completely attenuated. Now, why is that, in fact, so? First of all, if you look at the counterclaim, it wasn't even asserted against the proof of claim, Pierce's proof of claim. It was asserted against the nondischargeability complaint. If you look at Vicki's objection to the proof of claim, you will see the only defense that she asserted to the proof of claim on page SER6031 was an objection under Section 502 of the Code. She didn't assert truth of any various assertions, that kind of thing. The two claims are completely attenuated. They don't involve the same legal theories. They don't involve the same facts. As the district court determined properly so, and his defining is not clearly erroneous, they are completely attenuated as a matter of fact. All right. So as this Court explained in Los Angeles Trust, if the two are not the subject of the same subject matter, they're not sufficiently related, then, in fact, they cannot possibly be arising in, they cannot possibly something which is a, which in this Court's view would give rise to final order jurisdiction by the Bankruptcy Court. Now, this dovetails with the Second Circuit's decision in Connecticut National Bank v. Germain. There you had a situation in which there was a lender filed a claim for loan, and the trustee counterclaimed the State law lender liability causes of action. And the Second Circuit says, no, they're not clearly, they're not sufficiently related. Why? Because you don't need to resolve the lender liability claims in order to resolve the validity of the loan for bankruptcy purposes. The same thing happened here. Now, factually, also note that the Bankruptcy Court completely resolved, completely eliminated Pierce's proof of claim about a year before the Bankruptcy Court resolved Vicki's counterclaim. So not only was her counterclaim for tortious interference with an expectancy of a gift not asserted in response to Pierce's claim that any potential defamation liability might be nondischargeable, it wasn't asserted in response to it. The Bankruptcy Court easily resolved the proof of claim. It's a little broad. I mean, a counterclaim doesn't have to be set off for recoupment or something like that. Correct, Your Honor. For example, in the Dunmore case, you had the debtor's claim for a tax refund, and you had the IRS's claim for unpaid taxes. And there, this Court said, we have to analyze those two things separately. Why? Because the marathon principle predominates. And we also have an obligation, as this Court has recognized, to interpret the statute to avoid constitutional questions, the canon of constitutional avoidance. The Supreme Court has applied that canon in the bankruptcy context in the security industrial case under Section 522. And that canon applies here. When in doubt, what should you do? You should avoid the constitutional question, which is raised clearly here because it's a State law cause of action, and interpret the statute to avoid the constitutional problem. But we assume, just taking for purposes of argument, completing this argument, if we assume that it's noncore, where does that get you? Then the bankruptcy judge could only issue recommended findings of fact and conclusions of law subject to de novo review in the district court. The district court therefore properly vacated the Bankruptcy Court judgment. And that judgment, that $474 million judgment, was properly vacated. That, of course, is important to our preclusion argument, because we argue that before the district court entered his $89 million judgment, the probate court entered a final judgment disposing of all the claims, and the probate court judgment was properly res judicata collateral estoppel under the Full Faith and Credit Act against the ---- And does that bars the claim here? It does, Your Honor, under the Full Faith and Credit Act. But does it bars that it bars or that certain factual issues were resolved? Both, Your Honor. Actually, there are three separate preclusion arguments. One is the Special Preclusion Doctrine under Texas law, which says once a probate court has adjudicated the validity of an estate plan, all tortious interference claims that are based on theories contrary to that are barred. Her tortious interference claim, though, was directed against Pierce. Correct. He was personally. Correct. I mean, that's what the Supreme Court reminded us about. That's true, Judge Paez. But recall also ---- The tortious conduct was Pierce. Correct, Your Honor. Alleged tortious conduct. But ----  But importantly, her theory hinges upon one central premise. J. Howard intended to give her an inter-bibles gift in the form of a catch-all trust. The probate court said, in looking at his entire estate plan, what he intended, he never intended to give her a catch-all trust gift. He never intended to give her anything other than the $6 million in property he gave her during his life. So it cannot both be true, as the probate court found, that he intended, he did not intend to give her anything. And her theory, oh, no, he really did secretly intend to give me this thing. The probate judge, you can see how the two are completely inconsistent. And once the probate court determined, which was legitimate, who were the real entitlement, people who were entitled to his property, any tortious interference claim premised on a theory at odds with that is barred. Well, is it that a predicate for the tortious interference claim just doesn't exist if you give effect to the district, if you give effect to the probate court judgment? Yes, Judge Piazza, and here's why that is absolutely true. Under the Texas statute of frauds, the crumbs that Vicki sort of cobbles together to try to establish that there was a catch-all trust simply do not pass muster under Section 112.004, which requires a written instrument signed by the settlor. And under Texas law, the Texas Supreme Court has taught us that where you do not have such a signed instrument that's required by the Texas statute of frauds, you cannot bring a tortious interference claim to do an end run around that requirement. Now, what are the crumbs here? They're just a reference in a letter. They're a research memo. There's a mention of the word trust in some billing entries. Those are what I would call the crumbs. The statute of frauds requires the full loaf of bread. I don't recall seeing the statute of frauds argument until I read your supplemental brief. First of all, we did raise it in the Bankruptcy Court. Recall that Vicki did not actually assert or articulate her claim for tortious interference with an expectancy of a gift until trial in the Bankruptcy Court. As soon as she raised it during trial, we filed it the first opportunity in the proposed findings of fact and conclusions of law and objections to her proposed findings of fact and conclusions of law, the Texas statute of frauds. It was just a few days after she raised it, before the Bankruptcy Court rendered its decision. Before this Court, in our first set of briefing with this Court, we cited the Texas statute of frauds, 112.004. And this Court, in its prior decision, in discussing the elements for a trust under Texas law, quoted verbatim the relevant Texas statute of frauds that we cited. Now, when we briefed this issue for the first time before this Court, Vicki did not object to our raising that issue as part of one of our issues. We did. She did not object. So our argument is that not only did we preserve the issue, both before this Court and below, she waived any objection by not objecting to it initially. Most importantly, though, in Trammell Crow, the Texas Supreme Court has said. In Trammell Crow, you had a situation where you had actual slices of the loaf. You had a written representation agreement and an oral commission agreement. And the Texas Supreme Court said, sorry, you don't have a written commission agreement. Even though we are pretty certain there was a commission understanding, it's not sufficient to pass muster under the Texas statute of frauds, which in that case also required a written signed document. So what we have here in this case is less deficient, is more deficient, is less sufficient than what the Texas Supreme Court found deficient to support a tortious interference claim in Trammell Crow. Now, Vicki relies on the Clements case, but the Trammell Crow case specifically limited Clements to its facts. In Clements, you had an oral contract, I'm sorry, you had a written contract that was defective for lack of a single word. Basically, one crumb was missing off the loaf of bread. And the Texas Supreme Court in that case said, well, close enough. In Trammell Crow, however, where you had an oral contract, even more than we have here, the Texas Supreme Court said, no, you cannot do an end run. Now, to establish a trust under Texas law, you must have several requirements. A written instrument signed by the settlor that identifies the trust race, the trustees, the beneficiaries, the purpose. None of that is here. We don't know what the terms of this trust were. We don't know this catch-all trust, which is the heart of her claim. She says Pierce tortiously interfered with this supposed catch-all trust. There is no evidence that the trust actually exists. All the testimony is to the contrary. All of the witnesses testified that J. Howard never intended to do a catch-all trust. She puts together some references and some documents to try to fill that void, but it can't be filled as a matter of Texas law. When you start talking about what she tried to present, it gets into what the findings the district court made and whatnot. And I don't want to go there right now. Let me ask you this. Is your argument on preclusion, does it make any difference about the statute of frauds? The statute of frauds is an absolute bar. If the Court rules in our favor on statute of frauds, the Court need not reach any other issue. No, maybe my question wasn't correct. So the court in Texas, when it made its findings of fact, it found that E. Howard didn't intend to make a gift either during his life or after his death. Correct, both. Okay. If that's given preclusive effect in this case, if the bankruptcy, if the district court should have given that preclusive effect, why doesn't that eliminate her claim? The preclusion arguments do eliminate her claim, absolutely, Judge Paez. Which? Claim preclusion or issue preclusion? Both. I meant issue preclusion. Under issue preclusion, it clearly does, because the issue of J. Howard's intent was clearly litigated in the probate court. It was absolutely litigated, as Judge Wood carefully articulated both on the record but more importantly in his final judgment. J. Howard never intended to give her a gift either during his life or upon his death. Now, the response to that, though, is that she dismissed her affirmative claims in the probate court after the bankruptcy court's judgment was entered. Yes, Judge Paez. And then, but the district – but the probate judge allowed Pierce to amend in a claim or add a claim for declaratory relief, and they proceeded on. Well, not quite, Judge Paez. As this Court, I think, very properly and very carefully and correctly set forth in the prior decision in the factual section, Pierce already had pending a declaratory judgment action before she nonsuited, and he amended that declaratory judgment action, but as this Court pointed out, she was unsuccessful in withdrawing from the probate case, and in fact – But she was able to withdraw her claim. Claim, but not the declaratory judgment action, which was to determine all of her rights and interests, basically to get a declaration that she had no claim. And in fact, the probate court in its judgment said, granted Pierce the declaratory judgment relief and made all of its findings. She doesn't have a claim. There was no agreement. There was no intention. She is entitled to take nothing against Pierce, the probate court found. The probate court held that Pierce was entitled to his inheritance free and clear of any claim by Vickie. It was comprehensive in its scope, absolutely comprehensive in its scope. The issue was fully and fairly litigated. Vickie testified for six days during the probate trial, the five-and-a-half month jury trial. Vickie's counsel examined 15 witnesses. She presented many witnesses of her own. Vickie, there were over hundreds and hundreds of items of evidence that were presented. Over 40 witnesses testified. Every single one of Jay Howard's transactions, every single one of his estate planning documents, every single one of his statements, everything was poured over. His nurses testified. His accountants testified. His lawyers testified. It was completely comprehensive. Was there any issue presented to the district court that had not been considered by the bankruptcy court in that might get around the preclusive effect of the bankruptcy judgment? No, Judge Beeser. In fact, in fact, everything that was decided in the probate court, which was comprehensive Let me change that. The district court considered far less than what was considered in the probate court. The district court had five days of hearings. The probate court had a five-and-a-half month jury trial. The district court refused to hear Pierce's recipient witnesses, a number of them. The district court allowed Vicki to present all of her witnesses but refused to allow Pierce to present her recipient witnesses, for example, Finley Hilliard and Nancy Kutz, who were two of Jay Howard's accountants, who saw him sign the instruments, who were there. It was Finley Hilliard who read the estate planning documents to Jay Howard and could testify that he understood them. So it was a smaller set of issues that was decided in the district court and a much larger in the probate court. But the key issue was the same in both for issue preclusion, disintent. And also a key issue was were the documents tainted. I'd like to reserve the balance of my time for rebuttal, if I may. Thank you, counsel. Thank you very much. Counsel. Good morning, Your Honors. May it please the Court. Excuse me. I don't have quite the height of Mr. Brunstad. I'm Kent Richland, and I'm appearing on behalf of Howard K. Stern, executor of the estate of Vicki Lynn Marshall. Let me begin with one of the issues that the counsel ended with. And that has to do with this issue of the statute of frauds. This was an issue that, frankly, is and was not raised below as an affirmative defense, despite the fact that both Federal rules and State law in Texas requires that it be done so. And there's a reason for that. The party needs to be on notice that the statute of frauds is being pleaded. Here, the parties were never on notice. At the trial court level, both in the bankruptcy court and in the district court, the only mention of the statute of frauds was in a proposed finding of fact that was proposed by Pierce Marshall. Counsel, help me with something here. Yes, certainly. Good. When I went through your argument, it seems to me there are several steps to it. First of all, in order to resolve everything most favorably to your side, we'd say it's core. So the bankruptcy court has jurisdiction to decide and not merely to recommend. We would then say that the statute of frauds was waived because it wasn't pleaded as an affirmative defense. Correct. We still then get to the basis for the bankruptcy court's decision, which is what amounts to case-dispositive sanctions. On the case-dispositive sanctions issue, we have several decisions out, as you know, on when they're appropriate. The formula that we've laid out for when case-dispositive sanctions are appropriate is that discovery violations have reached a point where no reliable factual determination can be made in the case. In this case, when I look at the sort of discovery violations that are asserted, it looks to me as though they don't reach that level. Incorrect assertions of attorney-client privilege and work product, that sort of thing, they're pretty much routine. You have the documents that aren't produced. You have a fight over whether they're shielded or whether they need to be produced. And if the side that doesn't want to produce them loses, it produces them. The kind of cases where we've said the discovery violations prevent any reliable determination of the facts are different. They're where documents have been destroyed or altered. There's so much lying and substitution of pages and that sort of thing in the discovery, not in the merits case about which discovery is being done. Yes, Your Honor. I think that we'll never know what the facts were. I don't really see why this case, even if you go with your argument at every step down to that point, would justify case-dispositive sanctions. Well, several reasons, Judge Kleinfeld. First of all, of course, that issue has not been fully briefed on this appeal. God knows everything else seems to have been. But that issue was not fully briefed because we have been talking about the appeal from the district court opinion. But nevertheless, I think this record does reflect the kind of discovery violations that certainly qualify from this Court's jurisprudence for the kinds of evidentiary sanctions that were entered here. Should a sanction in amount have related to Pierce's net worth as opposed to the father's net worth? Well, I think what happened was that there were a number of sanctions, monetary sanctions imposed. What happened was that Pierce repeatedly refused to produce documents claiming attorney-client privilege. No. That's not my question. Yes. My question is the amount of the sanction is, what, $44 million? No. There was a determination. There was a $484 million judgment based upon the determination that there were issues that could not be proved because of the discovery violations. And most specifically and most important was the trust. She wins the whole shebang on her evidence because Pierce refused to produce things that he thought were privileged. Is that right? No. No, that's not it. Not that he thought were privileged, but he testified that his lawyer was holding, that his lawyer then refused to produce because the lawyer said, I'm not representing Pierce. It was a shell game. And what happened was, eventually, many of these documents were produced in the district court. About 400 boxes of documents were produced in the district court. But the important point is that the critical document in the case, of course, the one that this Court has asked questions about, the Statute of Fraud. Has your claim been allowed in Pierce's estate? Pardon me? Has your claim been allowed in Pierce's estate? At this point, because everything has been stayed by this Court, Your Honor, we've been foreclosed from making a claim in Pierce's estate. But the point is that the critical document, which the billing records showed, was produced, was the trust. The trust was produced by the lawyers, Hunter in particular, who was the confederate of Pierce. And that document, that key document, was never produced. Other documents that were all being produced at the same time, those all came in. And it was admitted that those three other documents that the memo referred to were all produced. But the trust itself was missing. And certainly, as the key document in the case. Let me ask you. Yes. I don't want to spend a lot of time on this sanctions issue. But my understanding, I don't know, you can correct me if I'm wrong, but my understanding was the Bankruptcy Court did impose these issue sanctions. Correct. For discovery of cases. When he conducted his first, when he issued his first decision, he relied on those issue sanctions. Yes. But then he later amended it. That's right. To eliminate relying on those sanctions. I think what he did was he relied on them less and he made findings of fact that were much more specific. Right. Okay. But he's still kind of, I can't figure out exactly what he did. It did, indeed, it did play a role in what they did. And gets to the district court and the district court vacates it. That's correct. We can talk about that. That's correct. But the district court then, I'm not quite sure what the district court did. Because the district court said, well, I'll do a de novo review. Start with what the Bankruptcy Court did. Yes. And I'm also going to take evidence. And I'm also going to do my own thing. Well. But in the end, he doesn't let, he doesn't really let everything in. It's kind of like a trial, but it's not a trial. That's weird. I think it is. The idea of de novo review is a little strange. Because what happens. I've never seen anything like this. I'm lost on that, too. I've seen a lot of de novo review proceedings. It's not de novo review if you make findings. Well, it's core. He can't make findings. I'm lost. Well, it's. Same reason Judge Paez. It is de novo review in this sense. He will, he is treating the findings of facts and conclusions of law of the Bankruptcy Court as mere findings of facts and conclusions of law. And along with that, does that assume that there was a full and complete airing of all the issues in the Bankruptcy Court? Yes. Now, if the sanctions had been affirmed and, you know, said they were all proper and whatnot, I could understand that. But it seems to me that they drop out and then they come back in, get to the district court, and it's just different. I've never seen anything like this. Well, it's unusual. But, of course, this has been an unusual case. What Judge Carter did was he said, I am going to review all of the documentation, all of the witnesses that were presented below, plus I'm going to look at additional material. And the additional material I'm going to look at is, includes these 400 boxes of documents that were never produced below, and that included, contrary to what counsel for the other side says, critical evidence that was never before the Bankruptcy Court. And that evidence was the billing records that showed that the trust was, in fact, drafted. It seems to me at that point what should have happened was been a whole read, you know, a whole new proceeding starting from the get-go. Well, I think that the district court is permitted under the authorities. But he said he didn't do that. He said it wasn't a trial. It was a de novo review. No, he is permitted to, I believe, tailor that de novo review in a way that will permit him to be able to most efficiently determine the cause. And what he said was, I'm going to look at all the material that was before the Bankruptcy Court. I'm going to look at what it decided. And, by the way, he did find that there were very substantial discovery violations. And he did say that if it were to be determined that there was insufficient evidence for me to uphold my judgment, I might very well conclude that the discovery violations would fill in all of those gaps. So that's an issue that remains undecided. But then he said, I want the parties to present the critical fact witnesses. And they were each permitted to identify critical fact witnesses. He said, I don't want to hold a whole new trial here because we've already had an enormous lengthy trial. I will look at everything that was presented, including everything that was in the Bankruptcy  In the Bankruptcy Court. But that really wasn't a full trial. Well, it certainly was a full trial. Every party was permitted to present every witness that they wanted to present. Only one side. Pardon me? Only one side. Oh, no, no, no. In the Bankruptcy Court? In the Bankruptcy Court. Certainly, both sides were permitted to present their evidence. But as I said earlier, he – the bankruptcy judge relied on the – He did take evidence. There's no question about that. From both sides. But he also – right. I'm saying he took evidence. Yes. But, you know, there's this funny business about these sanctions that I just can't quite get my head around. Well, I think his concern was that there were critical documents that were destroyed, shredded, documents that were responsive to requests of discovery, that there were  kept by the lawyer. And the lawyer then said, well, I'm not going to produce them. So that there was – there was sketchy evidence before him, but nevertheless more than sufficient evidence for him to conclude that, in fact, there was atrocious interference with the gift. If it's core, why wouldn't he have to just vacate and remand if he thought more evidence should have been taken or more evidence needed to be taken? Why wouldn't he just vacate and remand if it's core? Because that's the bankruptcy judge's jurisdiction. I think that Judge Carter did determine that it was not core. His determination was that this was not a core proceeding, and therefore, I would make – If it's not core, then it seems to me that he has to start from scratch. Well, that's – that – the authorities don't say that starting from scratch means that you have an entire new trial. The NOVA review means treating what has already been presented as findings of – as recommended findings of fact and conclusions of law. But that's limited specifically to certain witnesses, not the entire record. Oh, no, no. It was – he looked at the entire record. If you look at the entire record, it's about 14 feet on a shelf. That's correct. And he looked at every single document. He states in his opinion, I've looked – I've reviewed everything that was before the bankruptcy court. All the witnesses, every item of documentary evidence, which included substantial portions of the Texas probate trial and – and proceedings there, he did not back away at any moment from a full de novo review. He said, I don't have to listen to additional witnesses. I'm permitted to just look at what has already been presented and see if it's – I don't want to repeat myself. Yes. I want – you've got your time is up. Yes, yes, yes. But it just strikes me as strange that the trial in the bankruptcy court, when I look at that, it doesn't strike me that it was a full and complete trial because initially he started out saying, you've got these sanctions, and he proceeded with the sanctions. And then after he issued his decision, he came back and he said, ah, I'm going to back away from, you know, the judge – what's his name? I forget the other district court judge that was involved in here. I don't think the sanctions dictated the proceedings. What I think they – excuse me. Well, if that is so, then that argument has not been made in this court. It has not been made because we have been reviewing – it has been made in passing in this court, but it has never been joined in this court. But it's fundamental to the district court, what the district court did. Because the district court said, I'm doing a de novo review. Yes. Starting with what the bankruptcy court said. Correct. Presumably he took those findings of fact and he added to them. That's correct. He did. He heard additional witnesses and he added to them. And additional documentary evidence. It's kind of different. Well, it's an – I suppose it is somewhat unusual for when a judge does a de novo review and looks at the entire record that was before the magistrate, let us say, or in this case the bankruptcy court. It's somewhat unusual to say, you know what, I'm going to bend over backwards as this judge did and say, I have additional evidence from these – from the parties. I will let you present your critical. And that's what really happened here, Your Honor. And this was a de novo review that did involve review of every single document, every single witness that was before the bankruptcy court. It's not the same thing as de novo review. We do de novo review of summary judgment. Yes. But we don't take any new evidence. That's correct. That's correct. We take the findings of fact. That is absolutely correct. What Judge Carter did was he said, I'm going to go beyond that. I'm going to let the parties present additional evidence. Even if we felt like being super conscientious and said, we're going to go beyond that. We want to actually put a witness right there and have him testify. We'd be in error. We would be reversed. The Supreme Court would wonder what planet we were on. Well, it may be that an appellate court might be, but this is a district court sitting in review of a bankruptcy court. And it is sitting in review in the sense that it is permitted, I believe, under the authorities to take additional evidence to supplement whatever was presented in the bankruptcy court. Whatever that is, that's not de novo review. That's right. Well, it's de novo review in the sense that it was he started from scratch. Like in an ERISA determination, there's something like that. And in Social Security district court review, there's something like that. But it's not de novo review. Well, I don't want to belabor the point, but I will say it's de novo review in the sense that he reviewed absolutely everything that had previously been presented. He said, I am going to make my own determination based on all the evidence that has already been presented, and I will allow the parties to present additional evidence. But I understand that your position is that this is, that what the bankruptcy court did, his judgment, was in a core proceeding. You have a cross-examination on that, right? That's correct, that it was a core proceeding. Is this core or non-core? Well, it is a core proceeding, and it's a core proceeding because there was a proof of claim filed, and the result of filing that proof of claim was to proffer to the court the jurisdiction of the court with respect to any compulsory counterclaim that might be filed, core jurisdiction of the bankruptcy court. Now, I know that counsel has argued that there's another requirement here, that it's not enough for it to be a compulsory counterclaim, that it must arise in or arise under, but the case law is quite clear, including this Court's jurisprudence in Castle Rock, for example. It indicates that when a party files a proof of claim, as was done here, that that party is making a claim against the estate. That does arise under, uniquely arise under bankruptcy law because a claim against an estate is a claim that can only be made in the context of a bankruptcy court. Yes, it's true that the foundation for the claim may be in state law, but as a claim against the estate or a counterclaim by the estate against the creditor, those are claims that are uniquely bankruptcy court claims, and there is really a mountain of authority on that, the most recent being the Second Circuit's CBI case, which counsel mentions. And he now, I think, concedes that if this was a compulsory counterclaim, that indeed there would be core jurisdiction in the bankruptcy court. Why was this a compulsory counterclaim? It was compulsory. It doesn't look like a compulsory. I mean, by traditional notion that, you know. Arising out of the same transaction. What's the same transaction? Well, the transaction. What was the claim? The claim was that Vicki Lynn Marshall had defamed Pierce Marshall by claiming that he had manipulated his father's assets and defrauded his father. That's the counterclaim. That was the initial claim. In Pierce's file. He said that he had been accused, wrongly accused, of having manipulated his father's assets by Vicki Lynn Marshall. I presume he's seeking dischargeability. He started. A potential claim that she might have had against him in Texas for arising out of defamation. He initially filed a dischargeability complaint. He then filed a proof of claim, attached his dischargeability complaint to that proof of claim, and made it very clear that he was satisfied with adjudication of this in the bankruptcy court. And. Adjudication of what? The adjudication of both claims, both non-dischargeability and the underlying slander claim that he was asserting against her. So then she comes back and she says. And she says, I am forced to file a counterclaim that arises out of the same transaction because. Out of the alleged defamation. Out of, not the alleged, the substance of the alleged defamation. Because I'm asserting as a defense truth. You, in fact, did manipulate your father's assets to prevent me from getting the gift that he intended to give to me. So truth was asserted as, as a defense. And the counterclaim was precisely, precisely that, that same nexus of facts. So, so. Her claim is tortious interference. Correct. At certain elements. Correct. Tortious interference with a gift. And, but the theory behind it was that this had been accomplished by manipulating the father's assets, essentially draining J. Howard's assets from him so that he was not capable of being able to complete the gift. And the evidence is frankly overwhelming about that. In fact, one of the things that's striking about this case is that the district court found the evidence overwhelming on this. And yet, our opponents are arguing that there was no evidence whatsoever. There was evidence, not just circumstantial evidence, although there was a lot of that. But there was documentary evidence. There was course of practice evidence. The fact of the matter is that J. Howard, for both his previous wives, had made sure that they owned a substantial portion of the family business to protect them. In fact, his immediately previous wife, Betty, he had arranged for a new community that is the increase in value of his assets during the time of their marriage. He then went to his lawyer and said, I want you to accomplish a personal goal of mine, and that is make sure that my new wife-to-be gets a new community, just like my previous wife, Betty. And then he turns around and makes a marital gift of real property and money, and that's the end of the gift giving, right? Not true at all, Judge Beezer. What happened was that from the moment that he met her and fell in love with her and felt that she had saved his life because he was extremely despondent at that time and began to propose marriage to her, he gave her gifts from that day until the point at which he was drained of all his assets by Pierce and not able to give her any further gifts, but throughout that whole period of time. But all of these, none of these gifts were income-producing gifts. And what he said was, I need to give her a gift that will support her. Now, she was developing her own career at that time. She had become, frankly, by the time they married, an internationally famous model, but he said, I know that her life, the lifespan of her career is short. He told his lawyers this, and he said, she needs to have security. She needs to have some... He said, what, $6 million? There was approximately $5 million in gifts, none of which were income-generating, some of which, in fact, required income. There was testimony that the farm that was given to her required $190,000 a year to support. And he gave gifts to his previous wives, and he gave gifts to his previous mistress, those kinds of gifts. But this was something different, and he made that clear. Pardon me? What was the formula? Well, he went to his lawyer, and he said, I want you to accomplish this for me. I want you to make sure that this gift is to be accomplished. And that was then recorded in a memo. Now we're getting to what Texas spent months putting to a jury. No. And decided not true. None of this was before the Texas jury, Your Honor. None of this was asked of the Texas jury. And this is terribly important, and if I explain nothing else to this court today, this is what I want to explain. And that is... The Texas jury decided he wanted to give her what he gave her, and he never decided to give her more than what he gave her. This issue was not presented to the Texas jury. It was not before the Texas jury. It was not before the Texas jury. And we know that. Now, there are statements in the Texas judgment. The whole case was about whether he intended to give her more and was thwarted. Absolutely incorrect. The whole case was based on Howard III's and another son's attempting to establish that various wills and codicils were not valid. She, her own, she only intervened with claiming an interference with Torsh's gift when this probate exception business arose for the first time. But as soon as she was successful in the bankruptcy court, she dismissed that claim. She noncered it. That claim never went to a jury. It never was decided by the jury. Well, the claim, I mean, you're, you're, I, there's no, I, that appears to be correct. The claim had been dismissed, but she was still part of that case. She was part of the case only as a cross-defendant to the declaratory relief action that had been brought by Pierce. What was the debt relief that Pierce brought? And the debt relief action that Pierce brought, and that he was only allowed to bring because he persuaded the bankruptcy court that it would in no way affect what he did not or did not persuade the bankruptcy court. What did he do? Well, it doesn't in terms of the court. What did he do? What was he allowed to do in the probate proceeding? All he was allowed to do was ask one question concerning Vicki Lynn Marshall, and that was whether there was an agreement that J. Howard would give her half of his property. That was the only question asked. And, in fact, I think it's terribly important. The questions asked of the jury, and in Texas, probate matters are jury matters. So what do we do with this? This is what's troubled me about this whole, this, the point you want to make today, which is in the probate judgment, at paragraph 3.37, it says, it is further ordered a judge decreed by the court that J. Howard Marshall, too, did not intend to give and did not give to Vicki Lynn Marshall a gift or request from the estate of J. Howard Marshall or from the J. Howard Marshall, too, living trust either prior to or upon his death. Now, what is that? What that means is the I will tell you precisely what you do with that. You look at that language and you see what was before the bankruptcy court, what was actually tried. Because for issue preclusion, we have to know what was actually tried. The probate court. Excuse me, the probate court. It's what was actually tried or could be tried. If you're there. Well, for issue preclusion, no. For issue preclusion, it must have been actually tried and it must have been necessary for the determination that was made. Claim preclusion. For claim preclusion, it must have been a compulsory counterclaim or it must have been actually tried. I'm not even sure you're right on issue preclusion. I'll have to think about that more. On issue preclusion, it must be actually tried and it must be necessary. Right. I think it could have been. Well, this Court has, I believe this Court has held that many times. The point is that this was something that all of the questions asked to the jury, every single one of them asked two questions. We never do that on race judicata. We never read the transcript to see what questions were asked. But the burden is on the party who is claiming race judicata to establish that, in fact, it was tried, actually tried. You don't even look at the words of the judgment. But the words of the judgment here, and if you read what the probate court judge said when there was a discussion about the judgment that is in the record and that is talked about at some length, he said, I'm not adjudicating anything about a gift that was given to her. I'm not adjudicating anything about that. I'm adjudicating only issues with respect to what can be recovered from the estate or from the trust. And then the lawyer prepares a finding of fact that is, pardon me, a conclusion of law that's way beyond that, and the judge looks at it and signs it? Yes, Your Honor. And I will give you an example of why it is not, why you cannot take these findings of fact or conclusions of law, these portions of the judgment, as literal. On ER 4718, which is part of the 4718, which is part of the probate court judgment, at number 3.22, the last sentence of that provision is, further, the court finds that all decrees pertaining to Vicki Lynn Marshall, a.k.a. Anna Nicole Smith, and do not arise from any conduct that occurred on or before March 8, 1999. Now, if that were true, literally true, if that were literally true, then that means that none of this would have anything to do with anything that J. Howard Marshall did before that date. Well, of course it's not true. Of course that's not so. What this is, is a statement that was put into the judgment, again, supplied by Pierce's lawyers, that had to do with the date on which she declared bankruptcy in an attempt to show that any deaths that she owed were post-bankruptcy deaths. But the point is that there are statements that are made in a judgment that may sound as if they are broader than they really are. The judge made it clear. That's why we always have a proceeding where we invite objections to the form of the judgment. But that's also why the burden is on the party that is claiming issue preclusion to establish that the issue was actually litigated. That's usually done by the words of the judgment. Well, it may be done that way. But if the words of the judgment are ambiguous, which they are here because he is saying that he was a party in Texas, she could have objected to the form of the judgment. There was a lengthy discussion about this, Your Honor, and what the judge said. And that's part of the record. The judge said, I am not making any determination about that. What I'm saying is that she was not a beneficiary of the trust. She was not a beneficiary of the will. That's what I mean by that. That's all I can adjudicate. He said anything that's being adjudicated in California, that's up to California to adjudicate. Kennedy. Isn't that broad enough to trigger issue preclusion? Oh, no, no. Not at all. Because there is no claim whatsoever that she was a beneficiary of the trust. In fact, our entire claim depends upon her not being a beneficiary of the trust. So where was the money going to come from to take care of this intravivos gift that E. Howard Marshall intended to give her? Well, what the plan was, as the lawyer said before it was, that there would be stock issued, stock certificates issued in the family stock, that preferred stock that would be issued as that would dilute, obviously, the value of the stock. Who owned that? Who owned the stock? M.P.I., which is the Marshall Petroleum Company, was the owner of that. But the point being that, A. All of his stock was in M.P.I. and ultimately into Koch. Was it Koch or whatever it is? Koch. Koch? Yes. I thought it was in his living trust. The M.P.I. stock was in the living trust. However, he made great expenditures outside of that, basically by borrowing money, I guess. That's correct. But the point is that that's not what the issue was before the probate court. And it's not difficult to determine that it wasn't the issue before the probate court. All you need to do is look at the questions that were asked of the jury. So the court was just fooling around, all those? No, no, no. It was important. It was important for the court to say that she's not a beneficiary of the living  You can tell that just by reading the thing. What the testimony was for was to see whether that was the whole deal or there had been a promise to give her more money. The testimony that was provided by Vicki Lynn Marshall and her witnesses was before she dismissed her claim against Pierce. Once that was dismissed, that issue was no longer before the probate court. It just simply was no longer there. It was gone. Thank you, counsel. Thank you, Your Honor. Counsel, I believe you reserved a little time. Sorry, Your Honor? Counsel, I believe you reserved a little time. Yes, Your Honor. Thank you very much. Counsel for Vicki said, if there's one thing I'd like the court to understand, it's that the issue about tortious interference with expectancy of an interbibalist gift was not before the probate court. Let me quote to you Vicki's counsel's opening statement to the jury trial in the probate proceeding. Quote, this is a case about tortious interference with an interbibalist with an intent to give an interbibalist gift, close quote, ER 4068 and 4134. Vicki's counsel said to the probate jury this was about, in the probate court, this was about tortious interference with an expectancy of an interbibalist gift and all of the evidence that she later pursued in the district court, she pursued and presented in the probate court. Plus, if you look at page 28 of our supplemental brief, you will see this statement reproduced. It is absolutely crystal clear from the record, both from her pleadings and from her statements and from her testimony and from her argument in the probate court, that she was pursuing a claim for tortious interference with expectancy of a gift in the probate court based on all the same evidence she would then cite in the district court, all the same evidence. Now, it is not true that the district court heard all the witnesses. In fact, what is true, and we go to great lengths to demonstrate this, if you look at our blue brief on page 74 to 75, we outline the witnesses the district court refused to hear, percipient witnesses who were there, who saw what Jay Howard did. They were offered, their testimony was offered. And if you recall, what's also critically important is that the district court said, credibility of the witnesses is really important here. Yet he didn't hear the testimony of the key witnesses, so he couldn't determine their credibility. This has two fatal flaws in this case. One, he didn't hear the testimony of Finley Hilliard, Nancy Kuntz, the accountants, Yvonne Scurlock, the secretary, Betty Morgan, the nurse, Arnold Winch, the driver, Letitia Hunt. He said he wasn't conducting a trial. Correct. Yet he based his decision on the credibility of the witnesses, who he did not, in fact, see. How can you base your findings on credibility when you don't see the witnesses? Plus, he didn't hear these witnesses. Plus, he accepted the expert testimony, supposed expert testimony, of witnesses who were never permitted to testify to the authenticity of the signature in the probate proceeding, and without conducting a Daubert hearing or anything to determine that they were credible. So he was doing all kinds of things that you simply cannot do to support these findings. Now, I think it's important also to point out that the probate proceeding besides being completely comprehensive in scope was, as this court pointed out in its prior decision, not one that Vicki was able to leave. And Pierce's declaration, the declaratory judgments that he asked for, there are actually two sets of them up here at ER 3620 and ER 2196. Those declaratory judgments were not about one single issue. They were about a declaratory judgment about Vicki's rights and claims. And the probate court properly granted relief on those declaratory judgments because Vicki was in that proceeding. So it's not true that they were about a single issue. But ultimately, as I recall, the elements of the tortious interference claim were not actually presented to the jury. They were, Your Honor. The elements? Did you say the elements, the five elements? Her lawyer summarized all of them. I mean, wasn't there a series of interrogatory questions or something given to the probate jury? There were. That's right. And was there a question that said, did Pierce interfere with a gift that engaged in tortious conduct? No, there was not, because the bankruptcy court issued an injunction preventing those issues to be presented to the Texas jury. However, the district court vacated those injunctions before the probate court rendered its judgment. And then the probate court rendered its judgment after the injunction was lifted, and the probate court comprehensively determined all of the issues that were before the jury, which included Jay Howard's intent. And what is crystal clear from the probate court's judgment is that the probate court was deciding, the probate court was deciding that, in fact, Jay Howard did not intend to give her a gift of his assets that she's claiming. Now, the living trust is relevant because all of his assets were in the living trust. It's undisputed as a matter of the record. The gift that were going to come from somewhere would have had to have come from the living trust. Yes, but of this magnitude of tens of millions of dollars, it would have had to come from the living trust or nowhere. And so the probate court knew this because the living trust had been around since 1982, long since Jay Howard, before Jay Howard met Vicki. All of his assets were there except maybe his toothbrush. And accordingly, if there was to be a gift in the form of a catch-all trust or otherwise, it would have had to come out of the living trust. The probate court examined every single transaction, every single transaction. The probate judge said, I'm not leaving any of the legitimacy of these transactions left open. He considered all of them. And even though she cites the snippets of the record, some of the colloquy between the judge and the lawyers, the final judgment speaks for itself. It's crystal clear. Plus, also, as we summarize in our brief, if you look at the record and you look at, for example, SER 8663, you will see the probate court explained that it was, quote, not going to leave any open questions, close quote, about what Jay Howard intended or the validity of his estate planning transactions. So it's clear from the record the judgment speaks for itself. It's comprehensive in its scope. It demonstrates that these issues were fully and fairly litigated in the probate court in a five-and-a-half-month jury trial. That proceeding was conclusive. The judgment is crystal clear. In contrast, we didn't have any of those types of safeguards or much, much less in front of the district court in the de novo hearing. And, Judge Páez, on your question about what was — Better get to winding it up. Yes. Two remaining points. One point is that, Judge Páez, if you look at the bankruptcy judge's decision, you'll see in bold are all of the bankruptcy judge's findings based on sanctions. Those are the key findings in the case. On the discovery point, we go to great lengths in our blue brief, beginning on page 58, to demonstrate why all of those evidentiary sanctions were basically unfounded. There was no evidence to support them. In fact, after the bankruptcy judge initially entered his sanctions order, Pierce appealed that to the district court, and Judge Keller vacated the initial sanctions order. Why? Because there was no evidence to support any of the allegations of discovery abuse. They were simply the allegations of Vickie's counsel. When that order went back down to the bankruptcy court, the bankruptcy judge simply reimposed the same order without holding an evidentiary hearing and without adding certain footnotes that Vickie's counsel had submitted. There was no evidentiary hearing put in place. And as we detail in great length in the blue brief, with all the citations to the record, those discovery abuse sanctions were unfounded. There was no evidence that Pierce engaged in discovery abuse, just like there's no evidence, none, that Pierce destroyed any constructive trust document. In fact, all of the testimony is to the contrary, not constructive trust, catch-all trust. The evidence is that the witnesses said J. Howard never intended it. He thought about it. Counsel, it's time to wind it up. Thank you very much, Your Honor. Thank you, Counsel. Marshall v. Marshall is submitted, and we return for the morning.
judges: Beezer, Kleinfeld, Paez